| | |
|---|---|
| APPLIED SYSTEM TECHNOLOGIES, INC. and FCG ACQUISITIONS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE CHARTER OAK FIRE INSURANCE COMPANY OF AMERICA and TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, <br><br> *Defendants*. | **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> NO. __:26-CV-_____ |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

Plaintiffs Applied System Technologies, Inc. ("**AST**") and FCG Acquisitions, Inc. ("**FCG**") (together, "**Plaintiffs**") file this Original Complaint against Defendants The Charter Oak Fire Insurance Company of America ("**Charter Oak**") and Travelers Property Casualty Company of America ("**Travelers Property**," together with Charter Oak, "**Travelers**" or "**Defendants**"), and respectfully show the Court as follows:

## INTRODUCTION

1. This is an insurance coverage action for declaratory judgment, breach of contract, and violation of North Carolina's Unfair and Deceptive Trade Practices Act ("**UDTPA**"). This action arises out of Travelers' denial of coverage for an underlying claim brought by Nestlé Purina Petcare Company ("**Nestle**") against AST (amongst others) alleging covered "property damage." That claim began as a pre-litigation demand, escalated to a court lawsuit, which recently was stayed pending an arbitration proceeding that Nestle now has filed with the American Arbitration Association (the "**Underlying Claim**"). Plaintiffs requested that Travelers cover defense costs and

any ultimate judgment or settlement (indemnity costs) that AST incurs in connection with the Underlying Claim, under a primary-level policy issued by Charter Oak and an excess policy issued by Travelers Property (together, the "**Policies**"), both of which insure AST. But Travelers denied coverage.

2.      By denying coverage and refusing to fulfill its duty to defend AST against the Underlying Claim, Charter Oak breached the terms of, and its obligations under, the primary-level policy. Charter Oak's breach caused and continues to cause AST to incur substantial damages consisting of unreimbursed attorneys' fees and costs incurred defending AST against the Underlying Claim.

3.      And, depending on how the Underlying Claim is resolved, Travelers' wrongful denial of coverage—under both the primary-level policy and the excess policy—could cause AST to incur additional damages, namely, any amounts that AST incurs in connection with the ultimate resolution of the Underlying Claim.

4.      Therefore, in addition to seeking damages for Charter Oak's breach of its duty to defend and a declaratory judgment regarding its duty to defend going forward, Plaintiffs also seek a declaration from this Court that Travelers has a duty to indemnify AST for any costs it incurs in the resolution of the Underlying Claim, under both the primary-level policy and the excess policy.

5.      But this case is worse than a mere denial of coverage. That is because Travelers denied coverage despite AST explaining exactly how and why the Underlying Claim is covered by the primary-level policy. Indeed, AST pointed to specific underlying allegations that trigger coverage and cited significant case law supporting coverage; yet, instead of engaging with any of that material, Travelers issued cursory denial letters that did not explain why those allegations did not trigger coverage and why those cases did not apply. In other words, Travelers "[r]efus[ed] to

pay [AST's] claim[] without conducting a reasonable investigation based upon all available information," in violation of North Carolina's Unfair Claim Settlement Practices Act ("**UCSPA**"), N.C. GEN. STAT. § 58-63-15(11)(d), and, in turn, the UDTPA, *id.* § 75-1.1.

6. Moreover, because Travelers baselessly denied coverage and has offered AST nothing under the Policies, Charter Oak "[c]ompell[ed] the insured to institute litigation to recover amounts due under an insurance policy," in violation of the UCSPA, *id.* § 58-63-15(11)(g), and, in turn, the UDTPA, *id.* § 75-1.1.

7. Travelers' ongoing and imminent violations of North Carolina's unfair and deceptive trade practices statutes entitle AST to statutory damages, including treble damages and attorneys' fees and costs it has incurred and will continue to incur prosecuting this coverage action.

### PARTIES

8. Plaintiff Applied System Technologies, Inc. is a North Carolina corporation with its principal place of business located at 3915 Shopton Road, Charlotte, North Carolina 28217. AST is a subsidiary of FCG and a Named Insured under the Policies.

9. Plaintiff FCG Acquisitions, Inc. is a Delaware corporation with its principal place of business located at 3915 Shopton Road, Charlotte, North Carolina 28217. FCG is the Named Insured listed on the Declarations of the Policies and as such is assigned specific duties, rights, and obligations under the Policies, including responsibility for paying all premiums for those Policies.

10. Upon information and belief, Defendant Charter Oak is a stock insurance company and subsidiary of The Travelers Companies, Inc. Charter Oak is a corporation organized under the laws of the State of Connecticut, with its principal place of business located in Hartford, Connecticut.

11. Upon information and belief, Defendant Travelers Property is a stock insurance company and subsidiary of The Travelers Companies, Inc. Travelers Property is a corporation organized under the laws of the State of Connecticut, with its principal place of business in Hartford, Connecticut.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs. Indeed, Plaintiffs are citizens of North Carolina and Delaware, and Defendants are citizens of Connecticut. Plaintiffs have already incurred or will soon incur more than $75,000 defending AST against the Underlying Claim, and the plaintiffs in the Underlying Claim seek an amount in excess of $20 million plus additional loss of production damages.

13. This Court has specific, minimum-contacts personal jurisdiction over Defendants because Defendants sold the Policies to Plaintiffs in North Carolina, where Plaintiffs reside, and this case arises under those Policies.

14. This Court also has personal jurisdiction over Defendants pursuant to two North Carolina statutes.

    a. First, this Court has personal jurisdiction pursuant to N.C. GEN. STAT. § 1-75.4(10). Plaintiffs were citizens and residents of North Carolina when the property damage alleged in the Underlying Claim occurred, when the Underlying Claim was made, and when Travelers repeatedly denied coverage for the Underlying Claim. *See id.* § 1-75.4(10)a. And both the property damage alleged in the Underlying Claim and the submission and prosecution of the Underlying Claim, out of which this case arises, occurred in North Carolina. *See id.* § 1-75.4(10)b.

b.      Second, this Court has personal jurisdiction pursuant to N.C. GEN. STAT. § 58-3-5. Defendants were at all relevant times, and remain, admitted and authorized to conduct business in North Carolina, and Defendants conducted and continue to conduct such business. Defendants thus have consented to suit in North Carolina, including by completing the statutorily required registration procedures, which rendered them essentially at home in North Carolina.

15.     Venue is proper in the Western District of North Carolina under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims occurred within this District, including Travelers' issuance of the Policies and direction of claims-handling services to AST in Charlotte, North Carolina. And, if venue were improper under 28 U.S.C. § 1391(b)(2)— and it is not—then venue still would be proper under 28 U.S.C. § 1391(b)(3), since Travelers is subject to this Court's personal jurisdiction for the reasons explained in paragraphs 13-14, *supra*.

## FACTUAL BACKGROUND

### I.      The Policies

16.     Travelers sold primary and excess policies to FCG that cover, among other things, liability for property damage occurring during the policy period of July 1, 2022, to July 1, 2023. The primary-level policy bears the policy number Y-630-7N904417-COF-22 (the "**Primary Policy**"), and the excess policy bears the policy number CUP-9P294245-22-14 (the "**Excess Policy**"). The Excess Policy "follows form" to the terms and conditions of the Primary Policy, except to the extent, if any, that the Excess Policy expressly states otherwise. FCG is listed on the Declarations page of both Policies as the Named Insured, and FCG was responsible for paying the applicable premiums. Per endorsements in each policy, AST is an additional Named Insured under the Policies.

### A. The Primary Policy

#### (i) Insuring Agreement

17. The Primary Policy is a commercial package policy containing three coverage parts, but only one is relevant here—the Commercial General Liability ("**CGL**") Coverage Part. The CGL coverage part covers, among other things, liability for property damage up to $1,000,000 per occurrence and $2,000,000 in the aggregate.[1]

18. AST, as a subsidiary of FCG, is also a Named Insured pursuant to the Primary Policy's "General Purpose Endorsement."[2]

19. The Primary Policy's CGL coverage part contains an insuring agreement providing coverage for property damage liability. Specifically, the Primary Policy states in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages.[3]

20. The Primary Policy defines "property damage" as a "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured."[4]

21. The Primary Policy states that it applies to "property damage" occurring "during the policy period" that is caused by an "occurrence" that "takes place in the 'coverage territory.'"[5]

---

[1] A true and correct copy of the Primary Policy is attached hereto as <u>Exhibit A</u>.
[2] *See* Ex. A, General Purpose Endorsement.
[3] *Id.*, CGL Coverage Part, at § I.1.a.
[4] *Id.*, CGL Coverage Part, at § V.23.
[5] *Id.*, CGL Coverage Part, at § I.1.b(1)–(2).

22. The Primary Policy defines "occurrence" in relevant part as "[a]n accident, including continuous or repeated exposure to the same general harmful conditions."[6] And it defines "coverage territory" to include, among other places, the "United States of America."[7]

### (ii) The Primary Policy's exclusions, none of which apply

23. As explained below in section III, *infra*, Travelers has incorrectly denied coverage for the Underlying Claim, including upon the assertion that six exclusions contained in the Primary Policy (and therefore also in the Excess Policy) apply to bar coverage. The pertinent terms of those six exclusions are set forth in the below paragraphs 24 through 29. Those six exclusions do not apply for the reasons explained in section III, *infra*.

24. The Primary Policy excludes coverage for "property damage" that is "expected or intended from the standpoint of the insured" (the "**E&I Exclusion**").[8]

25. The Primary Policy excludes coverage for "property damage" when "the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement" (the "**Contractual Liability Exclusion**"), but the exclusion does not apply to liability for damages (1) "[t]hat the insured would have in the absence of the contract or agreement," or (2) "[a]ssumed in a contract or agreement that is an 'insured contract.'"[9]

26. The Primary Policy excludes coverage for "property damage" to "your product," as in, AST's product (the "**Your Product Exclusion**").[10]

27. The Primary Policy excludes coverage for "property damage" to "your work," as in, AST's work for a customer (the "**Your Work Exclusion**").[11]

---

[6] *Id.*, CGL Coverage Part, at § V.17.
[7] *Id.*, CGL Coverage Part, at § V.6.
[8] *Id.*, CGL Coverage Part, at § I.2.a.
[9] *Id.*, CGL Coverage Part, at § I.2.b.
[10] *Id.*, CGL Coverage Part, at § I.2.k.
[11] *Id.*, CGL Coverage Part, at § I.2.l.

28. The Primary Policy excludes coverage for "property damage" to "impaired property" or "property that has not been physically injured arising out," among other things, a "defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'" (the "**Impaired Property Exclusion**").[12] The Primary Policy defines "impaired property" as, among other things, "tangible property . . . that incorporates 'your product' . . . if such property can be restored to use by the repair, replacement, adjustment, or removal of 'your product.'"[13]

29. The Primary Policy excludes coverage for "[d]amages claimed for any loss, cost or expenses incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of . . . 'your product' . . . [i]f such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it" (the "**Product Recall Exclusion**" or **"Sister Products Exclusion"**).[14]

### B. The Excess Policy

30. The Excess Policy includes multiple coverage parts, but only its "Excess Follow-Form Liability" coverage part (the "**Excess Coverage Part**") is relevant here.[15] As its name suggests, that coverage part follows the form of the Primary Policy, providing the same coverage unless otherwise expressly provided by the Excess Policy. The Excess Policy's coverage is in excess of the Primary Policy's limits and will cover, in relevant part, liability due to property damage up to $10,000,000 per occurrence and in the aggregate.

---

[12] *Id.*, CGL Coverage Part, at § I.2.m.
[13] *Id.*, CGL Coverage Part, at § V.12. (emphasis added).
[14] *Id.*, CGL Coverage Part, at § I.2.n.
[15] A true and correct copy of the Excess Policy is attached hereto as <u>Exhibit B</u>.

31. As with the Primary Policy, AST is a Named Insured under the Excess Policy, pursuant to an endorsement titled, "Schedule Of Named Insureds."[16]

32. The Excess Policy states that Travelers Property "will pay on behalf of the insured those sums, in excess of the 'applicable underlying limit', that the insured becomes legally obligated to pay as damages" to which the Excess Coverage Part applies, "provided that the 'underlying insurance' would apply to such damages but for the exhaustion of its applicable limits of insurance."[17]

33. The Excess Coverage Part also states that "this insurance is subject to the same terms, conditions, agreements, exclusions and definitions of the 'underlying insurance', except with respect to any provisions to the contrary contained in this insurance."[18]

34. The Excess Policy defines "applicable underlying limit," in relevant part, as "the sum of" the "applicable limit of insurance stated for the policies of 'underlying insurance' in the Schedule Of Underlying Insurance" and "applicable limit of insurance of any 'other insurance' that applies."[19] That sum "will be considered to be reduced or exhausted," in relevant part, by "[p]ayments of judgments or settlements for damages that are covered by that 'underlying insurance'."[20] Travelers has _not_ asserted that any other insurance besides the Policies applies to the Underlying Claim.

35. The Excess Policy defines "underlying insurance," in relevant part, as "the policy or policies of insurance listed in the Schedule Of Underlying Insurance."[21]

---

[16] Ex. B, Schedule of Named Insureds.
[17] _Id._, Excess Coverage Part, at § I.A.1.
[18] _Id._, Excess Coverage Part, at § I.A.2.
[19] _Id._, Excess Policy, at § VI.A.1.
[20] _Id._, Excess Coverage Part, at § I.A.4.a.(1).
[21] _Id._, Excess Policy, at § VI.A.10.

36. The Excess Policy's "Schedule Of Underlying Insurance" endorsement identifies the Primary Policy as the only underlying "Commercial General Liability" policy.[22]

37. Taking paragraphs 16-36 above together, the Excess Policy provides the same CGL coverage provided by the Primary Policy upon exhaustion of the Primary Policy's limits. That is, the coverage under the Primary Policy as described in section I.A, *supra*, is also provided under the Excess Policy upon the exhaustion of the Primary Policy's $1,000,000 "per occurrence" policy limits or, if applicable, its $2,000,000 aggregate limits.

## II. The Underlying Claim

### A. *The Underlying Claim began as a pre-litigation demand and escalated to a court lawsuit that now is stayed pending an arbitration proceeding.*

38. On July 18, 2023, Plaintiffs received a letter from Ingersoll-Rand Industrial, U.S., Inc. ("**Ingersoll-Rand**") through which Ingersoll-Rand demanded that AST indemnify it for a claim brought against it by Mullins Mechanical & Welding, LLC ("**Mullins**") in connection with a project at a facility in Eden, North Carolina (the "**Project**"), owned by Nestle.

39. Shortly thereafter, Plaintiffs tendered Ingersoll-Rand's demand to Travelers for coverage under the Policies. Travelers acknowledged Plaintiffs' tender, but then denied coverage through a letter dated July 27, 2023, *see infra* ¶¶ 79-80.

40. As described further in paragraphs 81-84, *infra*, Plaintiffs and Travelers then exchanged multiple communications regarding Travelers' July 2023 coverage denial. Nevertheless, Travelers reaffirmed its coverage denial in October 2023.

41. Following Travelers' maintenance of its coverage denial in October 2023, the Underlying Claim effectively remained dormant until Nestle sent a letter to Ingersoll-Rand dated February 11, 2025, indicating that Mullins and another entity, Gray Construction, Inc. ("**Gray**"),

---

[22] *Id.*, Schedule Of Underlying Insurance.

had assigned their claims to Nestle for damages in connection with the Project, and that together with Nestle's own damages, Nestle was demanding payment from Ingersoll-Rand of approximately $80 million.

42. Ingersoll-Rand then submitted Nestle's demand to Plaintiffs as part of Ingersoll-Rand's prior demand for indemnity, and Plaintiffs then tendered to Travelers both Nestle's February 11, 2025 demand and Ingersoll-Rand's corresponding submission to Plaintiffs, via email dated March 12, 2025, *see infra* ¶ 85.

43. As described further in paragraphs 88-91, *infra*, through a letter dated July 8, 2025, Plaintiffs asked Travelers to reconsider its coverage denial for the Underlying Claim in light of Nestle's February 2025 demand and the potential for Nestle to bring a lawsuit against both Ingersoll-Rand and AST, but Travelers did not provide a substantive response.

44. Nestle then commenced a lawsuit, on November 3, 2025, by filing a complaint against Ingersoll-Rand and AST in the General Court of Justice, Superior Court Division, Rockingham County, North Carolina, in a case captioned *Nestle Purina Petcare Co. v. Ingersoll-Rand Industrial, U.S., Inc., et al.*, Case No. 25CV003647-780 (the "**Complaint**").[23]

45. Nestle's claims against AST asserted in the Complaint include claims of breach of implied warranty, negligent misrepresentation, violation of North Carolina's Unfair and Deceptive Trade Practices Act, and negligence. *See* Ex. C, Compl. ¶¶ 67-103.

---

[23] A true and correct copy of the Complaint is attached hereto as Exhibit C.

Plaintiffs deny Nestle's allegations in the Complaint and in the Underlying Claim at large, but that does not affect Charter Oak's duty to defend. "In determining whether an insurer has a duty to defend, the facts as alleged in the complaint are to be taken as true and compared to the language of the insurance policy." *Ortez v. Penn Nat'l Sec. Ins.*, 297 N.C. App. 114, 119, 910 S.E.2d 857, 862 (2024), *review dism'd*, 915 S.E.2d 175 (N.C. 2025), *and review denied*, 915 S.E.2d 177 (N.C. 2025).

46. Following service of Nestle's lawsuit, the parties agreed to arbitrate the dispute, and, upon that agreement, the court stayed the lawsuit pending the arbitration proceeding.[24]

47. Nestle filed its arbitration proceeding with the American Arbitration Association against Ingersoll-Rand and AST on March 26, 2026.[25] Nestle's arbitration demand incorporates by reference, and thus attaches, Nestle's Complaint from its stayed lawsuit. *See* Ex. E. The arbitration demand alleges damages in "an amount in excess of $20 million plus loss of production damages." *Id.* Because Nestle incorporates the allegations set forth in the Complaint, AST refers to those allegations herein.

**B.** ***The Complaint alleges property damage arising from mis-manufacturing of piping materials for a compressed air system.***

48. The Complaint alleges that the Underlying Claim "arises from defective compressed air piping materials that Ingersoll-Rand and AST supplied to" Nestle in connection with Nestle's plan to "establish a new manufacturing and distribution facility in Eden, North Carolina." Ex. C, Compl. ¶¶ 12–13.

49. The new facility was to measure 1.3 million square feet, and a "core utility" to be woven into the facility was a "compressed air system," which would "provide plant-wide distribution of compressed air." *See id.* ¶¶ 14, 18, 22.

50. Nestle contracted with Gray to design and construct the facility, and Gray in turn subcontracted with Mullins to, among other things, "supply and install[] . . . the compressed air piping system." *See id.* ¶¶ 16–18.[26]

---

[24] A true and correct copy of the court's ordering staying the lawsuit is attached hereto as Exhibit D.

[25] A true and correct copy of the arbitration demand is attached hereto as Exhibit E.

[26] The allegations in the Complaint state that the Mullins entity name was "Mullins Mechanical, LLC." Ex. C, Compl. ¶ 17. However, based on the exhibits attached to the Complaint, the entity name is Mullins Mechanical & Welding, LLC. *See id.*, at Exs. B, D (.pdf pages 106, 111 of 129).

51. A compressed air piping system "consists of air compressors that feed a network of pipes that are joined by fittings designed to create a sealed, leak-resistant distribution system." *Id.* ¶ 18.

52. Nestle alleges that, while Mullins was responsible for sourcing and installing the compressed air piping system, Mullins contracted with "Ingersoll-Rand to provide the . . . compressed air piping system." *Id.* ¶ 20. Ingersoll-Rand's system was called the "SimplAir 2.0 system," which is hereinafter referred to as the "**SimplAir system**." *Id.* ¶¶ 24–37.

53. Nestle further alleges that both "Ingersoll-Rand and AST" supplied the "materials" that comprise the SimplAir system, *see id.* ¶ 13, with those materials, in turn, consisting of fittings and piping, *see id.* ¶ 21.

54. Nestle does <u>not</u> allege that AST manufactured, sold, or installed all components associated with, or needed in connection with the installation of, the SimplAir system. *See generally id.* ¶ 21. Rather, the Complaint alleges that, at most, AST manufactured or supplied the required fittings and piping. *See id.* ¶¶ 13, 21, 25, 31, 48.

### C. *The Third-Party Supports that suspended the compressed air system off the ground.*

55. The Complaint makes clear that the SimplAir system, which consisted of a vast "network of pipes," was suspended off the ground of the facility. *See* Ex. C, Compl. ¶¶ 18, 22, 56, 66.

56. That makes sense because the system was designed to deliver compressed air to various "pneumatic systems that move ingredients, control[] the valves and actuators on lines, run[] the automated packaging equipment, and support[] sanitation and maintenance," all throughout the 1.3 million square foot facility. *See id.* ¶¶ 14, 18. Because those pneumatic systems are not at the same height off the ground, the compressed air system that delivers compressed air

to those systems must be suspended off ground. Suspending the compressed air system off the ground is also necessary because of the safety hazards that a ground-level network of pipes would present.

57.     Several portions of the Complaint refer to the supports and other materials that were needed to suspend the SimplAir system off the ground.

58.     For example, Gray's contract with Mullins (the "**Gray-Mullins Contract**"), which Nestle attached to its Complaint, discusses "support systems including, but not limited to hangers . . . and support structures." *See id.*, at Ex. B (.pdf page 87 of 129). The contract also notes that the support systems may impose "loads . . . on the building structure"—i.e., that the support systems would be connected to the building structure. *Id.*

59.     The Gray-Mullins Contract also refers to the use of "scaffolding, lifts, and hoists," which would be necessary only if Mullins were to install the SimplAir system materially above the ground level of the facility.

60.     Beyond the Gray-Mullins Contract, the text of the Complaint itself also discusses "supports" for the SimplAir system. *See, e.g.*, *id.* ¶¶ 56, 66.

61.     Nestle does not allege in its Complaint that AST manufactured, sold, or installed the referenced supports. *See generally id.*

62.     And AST did not in fact manufacture, sell, or install the referenced supports.

63.     The supports are therefore referred to hereinafter as the "**Third-Party Supports**."

**D.      *The Complaint indicates that the installation of the SimplAir system required welding.***

64.     The Complaint indicates that welding was required to install and affix the SimplAir system within the Nestle facility. For example, the Gray-Mullins Contract—which, as noted above, is incorporated by reference to the Complaint and arbitration demand, and attached thereto—refers

to welding services and indicates that those services were employed to "rout[e]" numerous "branch lines from the main [line]" of the SimplAir system to areas throughout the Project. *See id.*, at Ex. B (Scope of Work) (.pdf pages 81-101 of 129).

65.     Indeed, the Gray-Mullins Contract specifically contemplates that Mullins would provide "all welders" with their requisite tools and certifications to perform that work. *See id.* This is unsurprising in the context of installing a vast system of piping and fittings in a 1.3 million square foot facility and suspending that system off the ground.

66.     Through its references to welding services, the Gray-Mullins Contract indicates that at least portions of the SimplAir system that Mullins was to install—and/or materials connected to or touching the system—were welded together. *See id.* Those references thus indicate that removing portions of the SimplAir system required cutting through those welds. Such cutting constitutes physical damage—or, "property damage," as that term is defined in the Policies—to third-party (not AST) work and property, namely Mullins' work and Nestle's property.

### E.     *Nestle alleges it was forced to tear the SimplAir system out of the facility, and that doing so caused it to incur substantial damages, including to the Third-Party Supports and the facility itself.*

67.     The Underlying Claim centers on Nestle's allegation that the compressed air piping system that Ingersoll-Rand and AST supplied for the project was defective, due to, among other things, mis-manufacturing. The Underlying Claim further alleges that Nestle was correspondingly forced to rip-and-tear the compressed air piping system out of its facility, thereby physically damaging other surrounding property that AST did not manufacture or supply, including the Third-Party Supports and the Nestle facility itself. *See* Ex. C, Compl. ¶¶ 13, 56, 57, 66, 101.[27]

---

[27] "Rip-and-tear" is a term of art referring to the ripping, tearing, dismantling, demolition, deconstruction, destruction, damage, and/or removal of material that is often necessary to access and remedy defective component property. A classic example of "rip and tear" damage is the

68.     Indeed, Nestle alleges that following the completed installation of the SimplAir system for Line 1 (of 3) on or around March 2023, testing began and Nestle discovered "pervasive defects—including widespread leaks, inability to hold pressure, and other system failures—in the SimplAir . . . piping and fittings supplied by Ingersoll-Rand and AST." *Id.* ¶ 48.

69.     Nestle attributes those defects to, among other things, negligent manufacturing (or, mis-manufacturing). Indeed, Nestle specifically alleges that Ingersoll-Rand and AST breached their duty of care in manufacturing the SimplAir system by negligently "manufacturing SimplAir [] aluminum fittings prone to leaking." *Id.* ¶ 101.

70.     Nestle alleges that Gray's August 2023 "Impact Analysis" attributes a "five-month delay" in the Project and tens of millions of dollars in damages to the negligently manufactured SimplAir system. *See id.* ¶ 61.

71.     To remedy the alleged defects, Nestle engaged in a comprehensive, rip-and-tear process, and a corresponding replacement project, through which Nestle removed the allegedly malfunctioning SimplAir system from the facility and replaced it with a different, functional compressed air system with "replacement fittings" provided by Ingersoll-Rand and AST. *See id.* ¶¶ 54–57, 62.

72.     Indeed, Nestle alleges "[t]he defective system . . . caused [Nestle] to incur substantial damages, including [in connection with] repair-and-replacement . . . and [other] corrective work." *Id.* ¶ 58. Nestle alleges those damages exceed well over $56 million. *See id.* ¶ 65.

73.     To be clear, the rip-and-tear and replacement project extended not only to SimplAir system components, but also, naturally, to the Third-Party Supports that suspended the SimplAir

---

damage that is sustained to drywall in order to access and remedy defective electrical wiring—the drywall must be damaged (it often is cut through) in order to access and remedy the wiring that sits behind it.

system above the ground, and to the portions of the Nestle facility to which the Third-Party Supports were attached. The Third-Party Supports had to be ripped and torn out of the facility—just like the SimplAir system itself—and thus were physically damaged. During this process, the portions of the facility to which the Third-Party Supports were attached also were physically damaged. *See infra* ¶¶ 74-75. Indeed, Nestle alleges that the rip-and-tear and replacement project required "a switch to additional supports," and that it seeks "the costs to remove and reinstall piping and fittings (*with added supports*)." Ex. C, Compl. ¶¶ 56, 103 (emphasis added).

74. Nestle refers to the costs associated with the rip-and-tear of the Third-Party Supports elsewhere in its Complaint, too. For example, Exhibit E refers to the fact that Nestle and Mullins notified Ingersoll-Rand of the alleged defects and resulting repair and replacement work "through a series of communications in March, April, and May 2023." *Id.*, at Ex. E (.pdfs page 122–23 of 129). Upon information and belief, those communications included the chart created by Mullins that is attached to this Complaint as Exhibit F. That chart refers to over $2 million in repair and replacement work in June 2023 associated with "Additional Support Materials," "Removal/ Reinstallation of [Line] 1," and "Resealing of Penetrations." *See* Ex. F.

75. Upon information and belief, Nestle also seeks damages because the rip-and-tear and replacement project damaged—or "penetrated"—the walls and/or ceiling of the facility itself, and, naturally, Nestle now seeks the costs of repairing that damage from Ingersoll-Rand and AST. *See id.* That the walls and/or ceiling of the facility would be damaged makes sense in the context of the removal of a vast network of piping woven throughout the 1.3 million square foot facility.

76. Taking paragraphs 67-75 above together, due to the rip and tear out of the SimplAir system, other, third-party property was physically damaged. Documents incorporated into the Complaint indicate that, in ripping and tearing out the SimplAir system from the facility, the Third-

Party Supports were damaged, and the walls and/or ceiling of the facility were penetrated and thereby physically damaged. Through the Underlying Claim, Nestle seeks to hold AST liable for that physical damage to Third-Party property.

77.     As explained below, AST's alleged negligent manufacture of the SimplAir system constitutes an "occurrence" under the Policies, and the resulting damage caused by the rip-and-tear process constitutes "property damage" under the Policies, such that Travelers has a "duty to defend" against the lawsuit.

78.     But, instead of fulfilling and exercising its duty to defend, Travelers has denied coverage for the Underlying Claim.

## III.     Travelers' Denials of Coverage and AST's Resulting Damages

79.     AST, through its parent company and fellow Named Insured, FCG provided notice to Travelers of the Underlying Claim by no later than June 29, 2023, and noted the potential for the claim to escalate to a lawsuit. That was because, shortly before that time, Mullins had presented a demand for damages to Ingersoll-Rand, which, in turn, provided that demand to Plaintiffs, *see supra* ¶¶ 38-39.

### A.     *Travelers' 2023 denial letters lacked sufficient explanation and ignored information and case law provided by AST that supports coverage.*

80.     On July 27, 2023, Travelers issued a coverage position letter denying coverage for the referenced claim. In its denial letter, Travelers asserted three general grounds for denying coverage: (i) that the damage was not caused by an "occurrence"; (ii) that there was no "property damage" as defined under the Primary Policy; and (iii) that the various above-referenced exclusions applied to bar coverage.

81.     On August 4, 2023, AST sent a letter to Travelers, disputing the grounds for its coverage denial and asserting that Travelers' coverage letter was defective because it provided

only a "rote listing of Primary Policy terms, conditions and exclusions" without a clear, detailed explanation of each ground for the coverage denial. Given the cursory nature of Travelers' coverage letter, AST pointed out that the letter "constitute[d] a violation of the North Carolina Unfair Claim Settlement Practices Act and Unfair and Deceptive Trade Practices Act."

82. AST explained that Travelers' denial letter "asserts there has not been an 'occurrence,' but offers no explanation for the assertion," and that merely reciting the Primary Policy's broad definition of "property damage," and not explaining why Travelers believes there is no "property damage," falls short of the detailed explanation to which AST is entitled. Unlike Travelers, AST pointed to case law interpreting the terms "occurrence" and "property damage," and then requested that Travelers explain why interpretations that favor coverage would not apply in this case.

83. It took Travelers more than five weeks to even *acknowledge* AST's August 4, 2023 letter. And, after another seven weeks, Travelers finally issued a response letter dated October 30, 2023, in which Travelers maintained its coverage denial. As with its July 27, 2023 letter, the October 30, 2023 letter merely said that Travelers "must disagree with your interpretation of the policy terms and definitions." Without explaining how or why Travelers disagreed with AST's case law and arguments for coverage, Travelers simply "direct[ed] [AST's] attention to" various policy exclusions.

84. Indeed, all Travelers provided were rote recitations of various exclusions without any analysis or substantive explanation. Travelers asserted that it had "*no information* to support that [Mullins] and/or Ingersoll Rand sustained property damage that does not involve AST's product or involve AST's work." But that is patently false. Travelers had the Mullins and Ingersoll-Rand demand letters that discuss the rip-and-tear damage and loss caused by AST's allegedly

defective fittings. That is at least some "information to support that [Mullins] and/or Ingersoll Rand sustained property damage that does not involve AST's product or involve AST's work." Yet, Travelers made no attempts *whatsoever* to address those assertions of rip-and-tear damage, and instead concluded without *any* investigation or explanation that such damage was not covered.

85. The Underlying Claim effectively remained dormant until Nestle sent a demand letter to Ingersoll-Rand on February 11, 2025, seeking approximately $80 million in damages in connection with the Project. *See supra* ¶ 41. Ingersoll-Rand then forwarded that demand to Plaintiffs, who, in turn, forwarded the demand to Travelers via email on March 12, 2025.

### B. Plaintiffs 2025 letters provided additional information and support for coverage.

86. As noted above, the Underlying Claim effectively remained dormant until Nestle's February 11, 2025 demand letter.

87. Further to that February 11, 2025 demand letter from Nestle, coverage counsel for Plaintiffs engaged in conversations with Travelers' representatives, including a call on March 17, 2025, urging Travelers to reconsider its denial of coverage for the Underlying Claim given Nestle's February 2025 demand. Coverage counsel for Plaintiffs also conveyed that Plaintiffs would soon submit a letter responsive to Travelers' October 30, 2023 letter, which had reaffirmed Travelers' earlier denial of coverage.

88. Plaintiffs sent a detailed coverage letter to Travelers on July 8, 2025. The letter explained why Nestle's alleged damages arise from an "occurrence," why the alleged damages constitute "property damage," and why the exclusions cited by Travelers do not apply.

89. Specifically, in the July 8, 2025 letter, Plaintiffs explained that the alleged mis-manufacture of the SimplAir system constitutes an "occurrence," including because the issue was unexpected and unintended from AST's standpoint. Plaintiffs cited various cases applying North

Carolina law that hold that an alleged product manufacturing defect (or an instance of mis-manufacturing) constitutes an "occurrence" under a commercial general liability policy.[28]

90.    Plaintiffs further explained that Nestle alleged damages occurred "because of . . . 'property damage'" because the alleged mis-manufacturing required Nestle to rip-and-tear out the SimplAir system, thereby damaging surrounding third-party property, including the Third-Party Supports, in the process. And Plaintiffs further explained that courts have repeatedly held that, under general liability policies similar to the Primary Policy, "where an insured's defective part causes tangible property damage to other property, there is 'property damage,'" and that "damage to non-defective property in the removal of defective property constitutes an 'occurrence.'"[29] Plaintiffs even identified at least one case involving Charter Oak where the court came to the same conclusion.[30]

91.    Plaintiffs also explained that the exclusions that Travelers referenced in rote fashion in both of its 2023 coverage denial letters do not apply. Plaintiffs pointed to numerous cases that support its interpretations and applications to the facts.

---

[28] These cases included the following: *Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins.*, 351 N.C. 293 (N.C. 2000); *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99 (4th Cir. 2006); *Wayne Bros., Inc. v. N. River Ins.*, No. 01-cv-842, 2003 WL 22213615, at *1 (M.D.N.C. Aug. 20, 2003); *Penn Nat'l Sec. Ins. v. LinkOne SRC, LLC*, 542 F. Supp. 3d 355 (E.D.N.C. 2021).

[29] Plaintiffs cited to courts around the country that have coalesced around these principles. Including cases like the following: *Greystone Const., Inc. v. Nat'l Fire & Marine Ins.*, 661 F.3d 1272 (10th Cir. 2011); *Twin City Fire Ins. v. Lundberg, LLC*, No. 20-cv-1623, 2022 WL 393077, at *1 (W.D. Wash. Feb. 9, 2022); *Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd.*, 378 F. Supp. 3d 975 (D. Kan. 2019); *Standard Fire Ins. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1 (Tenn. Ct. App. 1998).

[30] *Dewitt Const. Inc. v. Charter Oak Fire Ins.*, 307 F.3d 1127 (9th Cir. 2002).

92.     It was not until September 26, 2025, that Travelers finally acknowledged receipt of Plaintiffs' July 8, 2025 letter, via email with a promise to respond to the letter within 30 days. October 26, 2025, came and went, but with no response from Travelers.

### C.     Travelers refused to address, let alone revise its position in light of, the new information and case law in Plaintiffs' 2025 letters and the Nestle suit against AST.

93.     Less than a week after that October 26, 2025 date, and specifically on November 3, 2025, Nestle sued AST. Just two days later, on November 5, 2025, Plaintiffs sent Travelers a copy of the Complaint, requested that Travelers reconsider its coverage position in light of the specific allegations in the Complaint, and demanded that Travelers honor its duty to defend.

94.     A month passed, and on December 3, 2025, Travelers finally acknowledged receipt of the Complaint by email, informing Plaintiffs that it would review the Complaint and determine whether coverage was triggered.

95.     Yet, only two days later, on December 5, 2025, Travelers informed Plaintiffs by email that it was maintaining its position, would not cover the Underlying Claim, and therefore would not provide AST with a defense against the underlying lawsuit.

96.     On December 8, 2025, Plaintiffs sent another detailed letter to Travelers, reiterating their demand for a defense under the Primary Policy and further explaining why Travelers was obligated to cover the Underlying Claim under the Policies.

97.     Specifically, in the December 8, 2025 letter, Plaintiffs explained that, under well-established law, Nestle's allegations that AST negligently manufactured the SimplAir system constituted allegations of "occurrence," as that term is defined in the Policies. Plaintiffs, once again, identified the cases that support that understanding of "occurrence."[31]

---

[31] *See supra* notes 28-30.

98.     Plaintiffs also explained that Nestle's allegations regarding the comprehensive, multi-million-dollar repair and replacement program—and the rip-and-tear process that necessarily was a component of that process—constituted allegations of "property damage," as that term is defined in the Policies. Plaintiffs pointed, once again, to cases from across the country that reached similar conclusions.[32]

99.     Plaintiffs also addressed the exclusions that Travelers had raised in its various coverage position letters as bars to coverage. Plaintiffs explained that, because some of the alleged property damage was to products that AST did not manufacture, supply, or install, the Your Product and Your Work Exclusions do not apply. Plaintiffs also explained that neither the Contractual Liability nor E&I Exclusions apply because, among other reasons, one of Nestle's claims against AST asserts pure negligence (and thus is not grounded in contract and does not allege expected or intentional acts). And the Impaired Property Exclusion does not apply, Plaintiffs explained, because the damaged Third-Party Supports, walls, and ceilings do not constitute "impaired property" given that they themselves were physically injured and did not "incorporate" the SimplAir system. Lastly, Plaintiffs explained that the Product Recall Exclusion did not apply because Nestle did not allege—nor could it—that the SimplAir system was "withdrawn or recalled."

100.    More generally, Plaintiffs reiterated that "[c]ountless courts have found that th[is] exact fact pattern triggers an insurer's duty to defend under an ordinary general liability policy"; that, under North Carolina law, an insurer's duty to defend is "more expansive than an insurer's obligation to pay damages"; and that when there is a "mere possibility" that the underlying allegations fall within the scope of coverage, the insurer has a duty to defend, "whether or not the

---

[32] *See supra* notes 29, 30.

insured is ultimately liable." Taking that altogether, Plaintiffs argued Travelers had a duty to defend AST.

101.    Just eight days later, on December 16, 2025, Travelers issued another letter reaffirming its declination of coverage, asserting that "the liability coverage provided under the commercial general liability policy is not triggered by any claims asserted in this matter."

102.    Travelers' December 16, 2025 letter failed to take into account the new developments and facts arising from the actual filing of the underlying lawsuit and failed to directly address *any* of Plaintiffs' arguments for why the allegations in the underlying lawsuit trigger Travelers' duty to defend—including the rip-and-tear damages to third-party property such as the Third-Party Supports. Travelers seemingly cut and paste its one-sentence conclusions from its original denial, stating there was no "occurrence" and no "property damage" alleged. And as it had done before, Travelers then pointed to various policy exclusions, recited the language, and failed to explain their relevance. Nothing from Travelers' letter demonstrates that any new analysis was done. Nothing from Travelers' letter indicates that *any* substantive investigation of the allegations was conducted.

103.    Despite the significant premiums paid to Travelers for the Primary Policy, when its insured finally made a claim for coverage under the policy, it did not explain how or why it was denying coverage beyond a few conclusory sentences. It also did not investigate information it was provided that, in the very least, left open the possibility of coverage. It also did not investigate or address any of the case law and arguments presented by Plaintiffs that support coverage. It is unfair claim settlement practices like this that gave rise to North Carolina's statutory protections.

104.    As a result of Travelers' unreasonable investigation of the Underlying Claim, denial of coverage, and refusal to defend AST, Plaintiffs have suffered substantial damages, including

unreimbursed attorneys' fees and costs incurred in defending against the Underlying Claim and prosecuting this coverage action, which it continues to incur as of the date of this filing.

## CAUSES OF ACTION

### I. Count One – Declaratory Judgment Against All Defendants, Under Both Policies

105. Plaintiffs incorporate each and every allegation set forth in this Original Complaint, *see supra* paragraphs 1-104, as if fully set forth in this section.

106. Plaintiffs' Declaratory Judgment claim is asserted in accordance with 28 U.S.C. § 2201.

107. The Policies issued by Travelers are valid and enforceable contracts.

108. The Policies cover AST as a named insured.

109. Plaintiffs have complied with the requisite terms and conditions under the Policies.

110. All premiums have been paid, and all conditions precedent, if any, to recovery under the Policies have been satisfied.

111. Through Nestle's Complaint, the Underlying Claim contains allegations that fall within the scope of coverage under the Policies.

112. Specifically, the Complaint alleges facts supporting "property damage," including for the reasons set forth in paragraphs 66-77, 88-90, and 98-100, *supra*. The Complaint alleges fact supporting that the "property damage" arose from an "occurrence," including for the reasons set forth in paragraphs 77, 88-90, and 98, *supra*. And none of the Policies' exclusions bar coverage for the Underlying Claim for the reasons set forth in paragraph 99, *supra*.

113. The Underlying Claim is therefore covered by the unambiguous terms of the Policies, such that Travelers has a duty to defend against the Underlying Claim under the Primary Policy, and a duty to indemnify Plaintiffs under the Policies for costs incurred in connection with the ultimate resolution of the Underlying Claim.

114.    In the alternative, to the extent there is any ambiguity in the terms of the Policies, such ambiguity must be construed in favor of coverage under North Carolina law.

115.    An actual, justiciable controversy exists between Plaintiffs and Travelers regarding Travelers' obligations to cover the Underlying Claim, defend against the Underlying Claim, and indemnify Plaintiffs for costs incurred in connection with the ultimate resolution of the Underlying Claim. Intervention of this Court is required to declare the rights of the parties under the Policies as to Travelers' obligations. The dispute between Plaintiffs and Travelers as to Travelers' obligations is real, definite, substantial, and ripe for determination by this Court pursuant to 28 U.S.C. §§ 2201, 2202.

116.    The uncertainty with respect to the rights, obligations, status, and legal relations under the Policies as to Travelers' obligations to cover the Underlying Claim and to defend and indemnify Plaintiffs is actual and concrete and has immediate and imminent consequences for Plaintiffs and Travelers.

117.    A single comprehensive judicial determination of the rights and duties of Plaintiffs and Travelers under the Policies with respect to Travelers' obligations is necessary to resolve the presently ripe dispute and controversy between the parties.

## II.    Count Two – Breach of Contract Against Charter Oak, Under the Primary Policy

118.    AST incorporates each and every allegation set forth in this Original Complaint, *see supra* paragraphs 1-117, as if fully set forth in this section.

119.    The Primary Policy covers AST as a named insured.

120.    The Primary Policy is a valid and enforceable contract between Charter Oak and AST.

121.    All premiums have been paid, and all conditions precedent, if any, to recovery under the Primary Policy have been satisfied.

122. AST has complied with all terms and conditions of the Primary Policy, including by tendering timely notice of the claim and the Underlying Claim to Charter Oak.

123. Through Nestle's Complaint, the Underlying Claim contains allegations that fall within the scope of coverage provided by the Primary Policy, including allegations of "property damage" caused by an "occurrence." *See supra* ¶¶ 66-77, 88-90, 98-100. And none of the Primary Policy's exclusions cited by Charter Oak as potentially relevant apply to the Underlying Claim. *See supra* ¶ 99.

124. Under the unambiguous terms of the Primary Policy, Charter Oak is therefore obligated to provide a defense against, and to pay the defense costs incurred by AST in, the Underlying Claim.

125. In the alternative, to the extent there is any ambiguity in the terms of the Primary Policy, such ambiguity must be construed in favor of coverage under North Carolina law.

126. Charter Oak has breached the Primary Policy by denying coverage for, failing to exercise its duty to defend in, and refusing to cover AST's defense costs in, the Underlying Claim.

127. As a direct, proximate, and legal consequence of Charter Oak's breach, AST has suffered substantial damages, including attorneys' fees and costs incurred in defending against the Underlying Claim, which it continues to incur as of the date of this filing.

## III. Count Three – Violation of North Carolina's Unfair and Deceptive Trade Practices Act (N.C. GEN. STAT. § 75-1.1.) (Failure to Conduct a Reasonable Investigation Based Upon All Available Information)

128. AST incorporates each and every allegation set forth in this Original Complaint, *see supra* paragraphs 1-127, as if fully set forth in this section.

129. Travelers conducted business in North Carolina by selling and issuing the Policies to FCG. The Policies provide coverage for Plaintiffs, as named insureds, for risks in North Carolina, among other places.

130. As part of that insurance business conducted with Plaintiffs in North Carolina, Travelers received Plaintiffs' tender of the Underlying Claim for coverage under the Policies.

131. In adjusting the Underlying Claim, Travelers failed to reasonably investigate all available information before denying coverage and reaffirming that denial of coverage. Despite possessing coverage-triggering information for years, Travelers did not investigate that information, deliberately ignored it, and maintained its incorrect denial of coverage. Multiple times, Travelers failed to address applicable case law that supports coverage under the Policies.

132. Plaintiffs provided all information requested by Travelers that was reasonably available and necessary to Travelers' adjustment of the Underlying Claim. Indeed, Travelers never suggested that it had inadequate or incomplete information to reach its coverage decision.

133. Despite assertions that it was reviewing all the information Plaintiffs provided through their numerous correspondences, Travelers willfully declined to investigate and consider case law and coverage-triggering information. That investigation was thus patently unreasonable.

134. Travelers' actions constitute violations of North Carolina's UCSPA, *see* N.C. GEN. STAT. § 58-63-15(11). Travelers' refusal to consider coverage-triggering information—e.g., the rip-and-tear allegations in the Complaint, etc.—in its investigation of the Underlying Claim, before denying coverage, was unreasonable. *See* N.C. GEN. STAT. § 58-63-15(11)(d).

135. Travelers willfully engaged in the above unfair and deceptive acts or practices and knew or should have known that its actions were frivolous and malicious.

136. Travelers' violations of the UCSPA were the direct and proximate cause of substantial damages to AST and thus constitute violations of North Carolina's UDTPA, *see* N.C. GEN. STAT. § 75-1.1.

137. Travelers' unfair and deceptive acts or practices were in and affected commerce in North Carolina.

138. As a direct and proximate result of Travelers' unfair and deceptive acts or practices, AST has suffered and continues to suffer substantial damages, in an amount to be determined at trial. Such damages include, among other things, significant exposure for AST in connection with the Underlying Claim, loss of benefits under the Policies, and the costs incurred in the prosecution of its claims for coverage in this lawsuit.

139. Travelers' unfair and deceptive acts or practices formed a continuous course of conduct that occurred over many months and constitutes an aggravated breach of contract. AST has also incurred and continues to incur significant, recoverable attorneys' fees and costs to obtain policy benefits to which it is entitled and which Travelers failed to provide under the Primary Policy. AST suffered these damages in North Carolina, where its principal place of business is located and the Underlying Claim is being litigated.

140. AST is entitled to automatic recovery of treble damages because of Travelers' violations of the UDTPA and UCSPA. *See* N.C. GEN. STAT. § 75-16.

141. AST is also entitled to an award of its attorneys' fees, pursuant to N.C. GEN. STAT. § 75-16.1, because Travelers committed these violations willfully and has engaged in an unwarranted refusal to resolve the matter, as well as prejudgment interest.

**IV. Count Four – Violation of North Carolina's Unfair and Deceptive Trade Practices Act (N.C. GEN. STAT. § 75-1.1.) (Compelling Insureds to Institute Litigation to Recover Amounts Due Under an Insurance Policy)**

142. AST incorporates each and every allegation set forth in this Original Complaint, *see supra* paragraphs 1-141, as if fully set forth in this section.

143. Charter Oak willfully denied coverage for the Underlying Claim under the Primary Policy, and failed to pay any benefits to AST under the Primary Policy.

144. Charter Oak was and currently is obligated to defend AST against the Underlying Claim under the Primary Policy.

145. AST has a valid and recoverable breach of contract claim against Charter Oak for its failure to provide coverage for the Underlying Claim under the Primary Policy.

146. Charter Oak's willful conduct compelled AST to institute this coverage lawsuit to recover amounts due under the Primary Policy.

147. Charter Oak's unfair and deceptive acts or practices were in and affected commerce in North Carolina. *See supra* ¶¶ 129-31.

148. Upon AST's successful prosecution of its declaratory judgment and breach of contract claims against Charter Oak in this coverage lawsuit, Charter Oak's conduct will constitute a violation of the UCSPA. *See* N.C. GEN. STAT. § 58-63-15(11)(g). Charter Oak's anticipatory and imminent violation of the UCSPA constitutes an anticipatory and imminent violation the UDTPA. *See* N.C. GEN. STAT. § 75-1.1.

149. Charter Oak's violation of the UCSPA and UDTPA were and are the direct and proximate cause of substantial damages to AST, which continue to be incurred. *See supra* ¶¶ 138-39.

150. AST is entitled to an automatic recovery of treble damages because of Charter Oak's violations of the UDTPA and UCSPA. *See* N.C. GEN. STAT. § 75-16.

151. AST is also entitled to a discretionary award of its attorneys' fees, pursuant to N.C. GEN. STAT. § 75-16.1, because Charter Oak committed these violations willfully and has engaged in an unwarranted refusal to resolve the matter, as well as prejudgment interest from the date of this Complaint.

## JURY TRIAL DEMAND

152. Plaintiffs demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER

WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

a. Judgment declaring that Charter Oak must perform its duty to defend under the Primary Policy with respect to the Underlying Claim by paying for AST's present and future defense costs and expenses incurred in connection with the Underlying Claim;

b. Judgment declaring that Travelers must indemnify Plaintiffs under the Policies for amounts AST incurs in connection with resolving the Underlying Claim;

c. Judgment awarding AST all damages it has suffered as a result of Charter Oak's breach of the Primary Policy and its duty to defend;

d. Judgment awarding AST all damages to which it is entitled as a result of Charter Oak's violation(s) of the UDTPA and UCSPA, including treble damages and attorneys' fees and costs;

e. Judgment awarding AST pre-judgment and post-judgment interest in the amount allowed by law;

f. Judgment awarding Plaintiffs all costs of court; and

g. Such other and further relief as is equitable and just, both at law and in equity, as Plaintiffs may show themselves justly entitled.

Dated: April 30, 2026　　　　　　　　　Respectfully submitted,

**HAYNES AND BOONE, LLP**

 */s/ Chelsea Corey*　　　　　　
Chelsea Corey
N.C. State Bar No. 48838
650 S. Tryon Street, Suite 700
Charlotte, North Carolina 28202
Telephone:  (980) 771-8251
Telecopier: (980) 771-8201
chelsea.corey@haynesboone.com

Barry I. Buchman[*]
Greg Van Houten[*]
888 16th Street, Suite 300
Washington, D.C. 20006
Telephone:  (202) 654-4574
barry.buchman@haynesboone.com
greg.vanhouten@haynesboone.com

Storm Lineberger[*]
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Telephone: (214) 651-5516
storm.lineberger@haynesboone.com

**ATTORNEYS FOR PLAINTIFFS**
**APPLIED SYSTEM TECHNOLOGIES, INC.**
**and FCG ACQUISITIONS, INC.**

---

[*] *Pro hac vice application forthcoming*